UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | 2:24-CR-57 |
| vs. | ) | |
| MARK ANTHONY TRENT, | ) | |
| Defendant. | ) | |

# REPORT AND RECOMMENDATION

Defendant filed a Motion to Suppress [Doc. 129] seeking the suppression of evidence obtained as the result of a March 13, 2024 traffic stop of the vehicle he was driving. The United States filed a Response [Doc. 141] in opposition to Defendant's Motion. On February 25, 2025, the Court held a hearing to address the motion. Present at the hearing were Defendant and his counsel, Douglas L. Payne, Esq., and Assistant United States Attorney Meghan Gomez. Special Agent John Bulla of the Department of Homeland Security Investigations ("HSI"), Sergeant Jacob Yeager and Lieutenant William Ford of the Sullivan County Sheriff's Department ("SCSD"), and Officer Billy Boyd of the Kingsport Police Department ("KPD") were called to testify by the United States. This matter is before the Court pursuant to 28 U.S.C. § 636(b) and the standing orders of the District Court for a Report and Recommendation. The matter is now ripe for resolution. For the reasons stated herein, the undersigned **RECOMMENDS** that the Motion to Suppress [Doc. 129] be **DENIED**.

## I. BACKGROUND

On June 18, 2024, a federal grand jury returned an indictment against Defendant charging him with conspiracy to distribute 50 grams or more of methamphetamine in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A); money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (h); possession with intent to distribute 50 grams or more of methamphetamine aided and abetted by another individual in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 18 U.S.C. § 2 and *Pinkerton v. United States*, 328 U.S. 640 (1946) (*Pinkerton* liability); and possession of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A), 18 U.S.C. § 2 (*Pinkerton* liability).

In his Motion, Defendant argues that his constitutional rights were violated during a traffic stop on March 13, 2024 when the stop was unreasonably extended to permit a K9 unite to arrive on the scene to conduct a free air sniff of his vehicle. [Doc. 129, p. 3]. More specifically, Defendant argues that officers did not have probable cause or reasonable suspicion to detain him beyond the time necessary to issue a traffic citation.[1] *Id.* Defendant asserts that because the search of his vehicle and person were the result of an unconstitutional detention, all evidence discovered during these searches must be suppressed as fruit of the poisonous tree. *Id.*

In response, the United States asserts that the traffic stop was lawful and was not unnecessarily prolonged by law enforcement. Rather, the government argues that Defendant and his passenger's refusal to exit the vehicle and allow a K9 to conduct a free air sniff unnecessarily extended the length of the stop. [Doc. 141, p. 9]. Additionally, the United States alleges that law enforcement had reasonable suspicion to believe Defendant was engaging in unlawful drug activity

---

[1] Defendant does not directly assert that the stop itself was unreasonable. Instead, it is the length of the stop that Defendant challenges.

and, as such, it was permissible for Defendant to be detained pending further investigation unrelated to the traffic violation. *Id.* at p. 10-11. Further, the government argues that even if the search of Defendant's vehicle was unreasonable, suppression of the evidence under the exclusionary rule would be inappropriate in this case because law enforcement was not acting in bad faith when conducting the traffic stop. *Id.* at p. 12-13.

## II. FINDINGS OF FACT

During the hearing held to address Defendant's Motion to Suppress, the United States first called HSI Special Agent John Bulla ("Agent Bulla") to testify. Agent Bulla testified that he has worked in law enforcement since 2009 and during that time has received extensive training related to narcotics investigations. As to his involvement in Defendant's case, Agent Bulla explained that prior to the traffic stop at issue, he was conducting a drug investigation and received information from an informant[2] that Saundra Hamilton ("Hamilton") was obtaining large amounts of methamphetamine from an individual known to be distributing methamphetamine in the Atlanta, Georgia area and would then return the drugs to Northeast Tennessee. This information was corroborated by two other informants, and law enforcement was then able to obtain a ping warrant to monitor the location of Hamilton's cell phone. Law enforcement also began surveillance of Hamilton's home, both by camera and direct officer observation. Leading up to the traffic stop of Defendant on March 13, 2024, officers had observed Defendant's rental vehicle frequenting Hamilton's residence. The rental vehicle was a black Ford Expedition, and Defendant was driving it at the time of the traffic stop. Agent Bulla further testified that drug traffickers commonly use

---

[2] Agent Bulla identified each of his informants and the Atlanta-area distributor by name during the hearing, but the Court did not find it necessary to include the specific identifies of informants in its Report and Recommendation.

rental vehicles since they are not registered in an individual's name so they are more difficult to track, and the vehicles can be rotated to avoid law enforcement detection.

SCSD Sergeant Jacob Yeager ("Sgt. Yeager"),[3] during his testimony, explained that he had personally observed this rental vehicle at Hamilton's home on March 3, 2024, and noted that through direct surveillance and the Hamilton ping warrant, he was able to confirm that Defendant and Hamilton travelled to the Atlanta area on March 3, 2024, and returned almost immediately. Agent Bulla advised that quick trips such as this are referred to as "turn and burn" trips by narcotics investigators. Agent Bulla conducted background checks on Defendant and Hamilton which revealed that both had prior drug charges. More specifically, he learned that Defendant had served a prison sentence for a conspiracy involving the distribution of Oxycodone and had been charged with a drug offense in Hawkins County, Tennessee in 2023.

Sgt. Yeager further testified during the hearing that on March 12, 2024, he again observed Defendant's rental vehicle arrive at Hamilton's residence. Defendant was driving the vehicle, and Hamilton soon got in, after which the two drove away from the residence. Agent Bulla testified that by monitoring Hamilton's cell phone location, law enforcement confirmed that Defendant and Hamilton traveled from Hamilton's residence straight to the Atlanta area via Interstate 75 and then began travelling back towards Hamilton's residence via Interstate 26 after spending only a short time in Georgia. Agent Bulla explained that changing routes on "turn and burn" type travel is another indicator of drug trafficking. At the same time, on cross examination Agent Bulla confirmed that there were no law enforcement agents in Georgia who observed Defendant's vehicle while there. He also acknowledged that law enforcement had not received any specific

---

[3] During the hearing, Sgt. Yeager testified that he has been working in narcotics since 2020 and has received extensive training.

information about this trip being planned for drug pickup and had not intercepted any of Hamilton's cell phone communications.

Agents began following Defendant's vehicle in the Asheville, North Carolina area and observed the vehicle travelling at varying speeds ranging from below the speed limit to over 100 miles per hour. They also noted that the vehicle had an illegal cover over the license plate. Agent Bulla stated that license plate covers such as this one are often used to prevent license plate readers from picking up the plate number thereby allowing drug traffickers to avoid detection. Agent Bulla testified that law enforcement decided they would attempt to stop Defendant's vehicle once it re-entered Sullivan County because they believed the vehicle contained a large quantity of methamphetamine. He explained that they wanted local law enforcement to conduct the stop instead of federal agents to avoid exposing their ongoing federal investigation. Agent Bulla advised that he was not in direct contact with the SCSD officer who made the stop but noted that he was communicating with other local law enforcement officials who were in contact with the officer. Agent Bulla stated that he conveyed information to those officers about the criminal histories of Defendant and Hamilton while sharing in real time the details of the trip the two were in the process of making.

Sgt. Yeager testified that he was in contact with Agent Bulla, and that he contacted SCSD Lieutenant William Ford ("Lt. Ford"). The sergeant stated that he provided Lt. Ford with a description of Defendant's vehicle and the license plate number and instructed him to conduct a traffic stop of the vehicle if he had probable cause to do so. Sgt. Yeager also advised Lt. Ford that Defendant and Hamilton were believed to be the occupants of the vehicle and were suspected to be returning from obtaining drugs in Georgia, that the vehicle had been observed travelling at a high rate of speed, and that it had an illegal license plate cover. Sgt. Yeager testified that he

personally began observing Defendant's vehicle on Interstate 26 just over the Tennessee state line at approximately 1:00 a.m. He also testified that traffic was light, so he was able to easily follow the vehicle and had personally observed it to be speeding. The sergeant further testified that he was travelling behind Lt. Ford when he stopped Defendant's vehicle, so he was able to observe the traffic stop and to confirm that Lt. Ford stopped the same vehicle Sgt. Yeager had seen leaving Hamilton's residence on both March 3 and March 12, 2024.

During his testimony, Lt. Ford[4] confirmed that he was contacted by Sgt. Yeager in the early hours of March 13, 2024, and was provided with a description of Defendant's vehicle and the identities of the suspected occupants, while also being made aware that the vehicle was believed to be returning from a drug pickup. Lt. Ford testified that upon receiving this information he contacted the KPD and asked that a K9 unit be on standby to assist in a traffic stop. Lt. Ford observed Defendant's vehicle travelling on Interstate 26 at 70 miles per hour in a 65 mile per hour zone and crossing the fog line, and he noted the illegal cover over the vehicle's license plate. Upon making these observations, Lt. Ford testified that he determined he had probable cause to conduct a traffic stop and proceeded to pull over Defendant's vehicle. The lieutenant advised that the stop took place at approximately 2:00 a.m.[5] on March 13, 2024,[6] and explained how he approached the vehicle and spoke to the driver and passenger after making the stop to confirm they were the individuals who had been suspected to be in it. Lt. Ford also confirmed the vehicle was a rental

---

[4] Lieutenant Ford testified that he has 21 years of law enforcement experience and has received specialized drug training specifically focusing on methamphetamine.

[5] The time stamp on the video reflects that it begins at 00 hours (midnight) instead of 0200 hours. The parties stipulate that the time stamp is incorrect, and the video did in fact begin recording at 2:00 a.m.

[6] Video of the stop was recorded by Lt. Ford's dash camera, although there is no audio recording. The video of the stop was entered into evidence as government's Exhibit 1. The entirety of the video was not played during the hearing, but the Court has reviewed the full video recording.

and noted that despite being new, the inside of the vehicle was "trashy" with various items strewn about. He testified that in his experience this is common for vehicles used in trafficking narcotics.

Lt. Ford obtained drivers' licenses from Defendant and Hamilton along with the rental documents and returned to his vehicle to check for any outstanding warrants the two might have and to call for a K9 unit to respond to the scene. At 2:07 a.m., Lt. Ford was advised by dispatch that Defendant and Hamilton were "all clear." He was also advised that a K9 unit was en route. Lt. Ford testified that he wrote a warning citation before he exited his vehicle at 2:10 a.m. Upon exiting his vehicle, Lt. Ford observed a KPD K9 unit pass on the westbound lane of I-26. He testified that when he saw the K9 unit, he knew it would arrive on the scene imminently, so he placed the citation, the rental paperwork, and the drivers' licenses for Defendant and Hamilton on the hood of his police vehicle instead of delivering the documents to them. The lieutenant then approached Defendant's vehicle and asked for consent to search, and simultaneously advised Defendant that a K9 was on the scene to conduct a free air sniff. Additionally, he instructed Defendant and Hamilton to exit the vehicle, but both refused.

By 2:11 a.m., Defendant had denied consent to search and Lt. Ford had returned to stand in front of his police vehicle. After a brief discussion with another officer, Lt. Ford approached the passenger side of Defendant's vehicle at 2:11:45 a.m. and again instructed Defendant and Hamilton to exit the vehicle. Lt. Ford testified that Defendant and Hamilton continued to refuse to exit the vehicle, which led to a several-minutes-long exchange between the occupants of the vehicle and law enforcement. During this time, an officer placed "stop sticks" under the front tires of the vehicle to prevent the vehicle from leaving the scene. Lt. Ford explained that Defendant had a prior evading arrest charge, and he was afraid he would attempt to flee the scene in the vehicle. He further explained that Defendant's vehicle could outrun the police vehicles so if Defendant did

flee the scene, it was unlikely that law enforcement would have been able to catch him. At the same time, Lt. Ford stated that Defendant and Hamilton were largely cooperative during the stop and there were no indications that they were attempting to flee or leave the scene.

KPD K9 Officer Billy Boyd[7] ("Officer Boyd") testified that he received the call to respond to the traffic stop at 2:03 a.m. and arrived on the scene a short time later. While Officer Boyd's arrival is not depicted by the dash camera video, Officer Boyd's reports of the call reflect he arrived on the scene at 2:11 a.m.,[8] roughly the same time as Lt. Ford was asking for consent to search the vehicle. Officer Boyd testified that he was on the scene for several minutes before he was able to conduct the free air sniff of the vehicle because he saw other officers "arguing" with the occupants of the vehicle. He also testified that he observed the "stop sticks" being placed in front of the vehicle. Officer Boyd explained that occupants are always asked to exit the vehicle before a free air sniff is conducted to protect officer safety. He testified that after a few minutes, he saw the occupants exit the vehicle and was able to approach the vehicle and conduct the free air sniff. The video reflects that the free air sniff occurred at 2:19 a.m. Officer Boyd stated that his K9 alerted on the driver's door of the vehicle, and after the positive alert, Defendant's vehicle was searched. During the search, officers located a box containing a large amount of a crystal substance believed to be methamphetamine behind the driver's seat of the vehicle.

### III. ANALYSIS

#### a. Duration of the Stop

The Fourth Amendment guarantees "[t]he right of the people to be secure ... against unreasonable searches and seizures...." U.S. Const. amend. IV. A traffic stop by a police officer is

---

[7] Officer Boyd testified that he has 24 years of law enforcement experience and has received extensive K9 and narcotics training.
[8] These reports were entered as defense collective Exhibit 3.

a "seizure" within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). A traffic stop is permissible when law enforcement has probable cause to believe that a traffic violation has occurred. *United States v. Simpson*, 520 F.3d 531, 539-40 (6th Cir. 2008). Additionally, during a traffic stop, officers may order drivers and passengers out of the vehicle. *United States v. Noble*, 762 F.3d 509, 521 (6th Cir. 2014).

"When a traffic stop is supported by probable cause, an officer's subjective intent is irrelevant." *United States v. Lott*, 954 F.3d 919, 922 (6th Cir. 2020); *see also United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (observing that "[t]he stop is reasonable if there was probable cause, and it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop"). At the same time, probable cause to believe a traffic violation has occurred "does not allow the police to detain a suspect indefinitely." *United States v. Davis*, 430 F.3d 345, 353 (6th Cir. 2005). A traffic stop may last no longer than necessary to accomplish the purpose of the stop. *United States v. Rodriguez*, 575 U.S. 348, 354 (2015) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). The mission of issuing a traffic citation includes incidental inquiries such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. *Id.* at 355. "A dog sniff, in contrast, is not a task incident to ordinary traffic stops, but rather is an effort aimed at detecting evidence of ordinary criminal wrongdoing. An ordinary traffic stop, therefore, cannot be extended to accommodate a dog sniff *without reasonable suspicion of criminal activity*." *United States v. Salas*, 820 F. App'x 405, 411 (6th Cir. 2020) (cleaned up) (emphasis added). Put another way, "any extension of a traffic stop absent independent reasonable suspicion is improper. This is a bright-line rule." *Hernandez v. Boles*, 949 F.3d 251, 256 (6th Cir. 2020) (citing *Rodriguez*, 575 U.S. at 355-57). Under this rule, any suspicion-less extension of a traffic stop, no matter how brief,

is "constitutionally significant." *United States v. Malone*, No. 2:23-CR-00120-11-JRG-CRW, 2024 WL 4182947, at *6 (E.D. Tenn. Sept. 13, 2024).

As an initial matter, the Court notes that probable cause for the traffic stop existed because prior to the stop Lt. Ford observed Defendant driving over the speed limit, crossing the fog line, and having an illegal cover over his vehicle's license plate. Given that the stop was lawful, the Court must then turn to the issue of whether the duration of the stop was reasonable.

During the hearing, Defendant argued that the purpose of the stop was to address suspected traffic violations and that the stop was impermissibly extended when Lt. Ford retained his driver's license and other documentation instead of delivering them and the completed warning citation to Defendant, which would have completed the traffic stop. Stated differently, Defendant claims that Lt. Ford's actions in awaiting the arrival of the KPD K9 unit rather than concluding Defendant's traffic stop was impermissible under *Rodriguez's* bright-line rule against extending a traffic stop beyond the time necessary to complete its purpose.

The Court first notes that roughly one minute elapsed between the time Lt. Ford completed the tasks related to Defendant's traffic stop, i.e., receiving word that Defendant's license was "clear" and completing the warning citation, and the arrival of Officer Boyd on the scene with his K9 to conduct the free air sniff. However, even a one-minute extension is constitutionally significant. *See Malone*, 2024 WL 4182947, at *6, n.5 ("Post-*Rodriguez* courts have found that less time than is at issue here constituted an unlawful extension of a traffic stop. *See e.g. United States v. Lujan*, No. 4:17-cr-37, 2018 U.S. Dist. LEXIS 132229, at *16–17, 2018 WL 3742452 (E.D. Tenn. Aug. 7, 2018) (twenty seconds of "roadside interrogation"); *United States v. Dehoyos*, 652 F. Supp. 3d 240, 254 (N.D.N.Y. 2023) (one minute sixteen seconds while officer talked on phone and interviewed the defendant for a second time); *United States v. Brinson*, No. CR 119-

096, 2019 U.S. Dist. LEXIS 223821 at *8, 2019 WL 7476672 (S.D. Ga.), *report and recommendation adopted*, 2020 U.S. Dist. LEXIS 875, 2020 WL 59728 (S.D. Ga. Jan. 3, 2020) (one minute forty seconds of questioning defendant to determine if he was transporting drugs)"). Had the events at issue been nothing more than a routine traffic stop, this determination would likely end the Court's inquiry. But here, Defendant was not pulled over simply because officers observed traffic violations. Instead, the vehicle was pulled over, in part, because officers believed that Defendant was participating in illegal drug activity while also violating traffic laws.

The Sixth Circuit has explained that *Rodriguez*'s holding is narrowly tailored to determine "whether police routinely may extend an otherwise-completed traffic stop, *absent reasonable suspicion*, in order to conduct a dog sniff." *Salas*, 820 F. App'x at 412 (quoting *Rodriguez*, 575 U.S. at 350) (emphasis in original). Accordingly, "even if minor delays to conduct a dog sniff are unconstitutional for routine traffic stops, officers may still extend a stop to conduct a dog sniff when such action is supported by reasonable suspicion of criminal activity." *Id.* Thus, the Court must determine whether officers' belief that Defendant was participating in illegal drug trafficking activity was supported by reasonable suspicion.

**b. Reasonable Suspicion for Extraneous Investigation**

It is well-settled that law enforcement "may briefly stop an individual for investigation if they have 'reasonable suspicion' that the person has committed a crime." *Houston v. Clark Cnty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 813 (6th Cir. 1999). "Reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *United States v. Taylor*, 121 F.4th 590, 595 (6th Cir. 2024) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). Still, reasonable suspicion must be supported by something more than the officer's "inchoate and unparticularized suspicion or

'hunch.'" *Id.* (quoting *Wardlow*, 528 U.S. at 124). To determine whether reasonable suspicion exists a court must consider the totality of the circumstances. *Id.* "That includes the officer's own observations as well as information the officer receives from police reports, dispatch, and fellow officers. It also involves commonsense judgments and inferences about human behavior, as well as inferences the officer may draw based on his experience and specialized training." *Id.* (quoting *United States v. McCallister*, 39 F.4th 368, 374 (6th Cir. 2022)). The Sixth Circuit has advised that "[e]ven entirely innocent behaviors may establish reasonable suspicion in some circumstances." *Id.*

The United States argues that "reasonable suspicion [of drug activity] was developed prior to the traffic stop and [further] during the traffic stop." [Doc. 141, p. 10]. Here, Lt. Ford stopped Defendant's vehicle at the request of other officers which implicates the collective knowledge doctrine. *See United States v. Mendoza-Ricardo*, 815 F. App'x 970, 976 (6th Cir. 2020). Under the collective knowledge doctrine,

> 'an officer may conduct a stop based on information obtained by fellow officers' rather than information the detaining officer [himself] possesses. This doctrine applies 'whenever a responding officer executes a stop at the request of an officer who possesses the facts necessary to establish reasonable suspicion,' since in that case, the officer is effectively acting as the other officer's agent.

*Id.* (quoting *United States v. Lyons*, 687 F.3d 754, 765-66 (6th Cir. 2012)). Here, in addition to having probable cause to stop Defendant for traffic violations, Lt. Ford knew that his fellow officers suspected that Defendant and the passenger of his vehicle were presently engaging in drug trafficking. The record establishes that he was asked to stop Defendant's vehicle by Sgt. Yeager who passed along to the lieutenant information he had received from Agent Bulla regarding Defendant, his passenger, and their activities. Agent Bulla had formed his belief that drug trafficking was afoot only after multiple sources named Hamilton, Defendant's passenger, as a

drug distributor in the area. In addition to information obtained from these sources, officers had personally observed Defendant's rental vehicle at Hamilton's residence and knew from information received from the Hamilton ping warrant that this was the second time in little more than a week that Hamilton and Defendant had made a quick trip to Georgia together, described as a "turn and burn." Moreover, they knew that both Defendant and Hamilton had criminal histories which included drug offenses. These facts alone are more that sufficient to establish reasonable suspicion. Further, Lt. Ford's observations of Defendant's speeding and swerving along with the disheveled condition of the interior of this virtually new and rented vehicle did nothing to dispel the suspicion.

Having now determined there was reasonable suspicion to conclude that Defendant was participating in drug activity, the Court must determine whether this investigatory stop was reasonable under the Fourth Amendment. *See id.* ("While reasonable suspicion can support stopping a vehicle for the purpose of investigating non-traffic criminal activity, the subsequent detention must still be reasonable under the Fourth Amendment.").

"[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id.* (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). To meet this standard, officers must have "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). In making this determination, the Court must consider "whether the detention was (1) sufficiently limited in time and (2) involved the least intrusive means that were reasonably available." *Id.* (citing *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005)).

Here, the record demonstrates that a key purpose of Defendant's stop was to determine whether Defendant's vehicle contained illegal drugs, specifically methamphetamine. To investigate this suspicion, Lt. Ford called for a K9 officer to conduct a free air sniff almost immediately upon stopping Defendant's vehicle, and Defendant was detained for a total of 11 minutes before the K9 arrived, 10 of which were spent investigating traffic offenses.[9] In instances of suspected drug trafficking, courts have routinely found longer delays than the one at issue here to be reasonable. *See, e.g.*, *Mendoza-Ricardo*, 815 F. App'x at 977 (upholding a fifteen-minute detention); *United States v. Perez*, 440 F.3d 363, 367-69, 372-73 (6th Cir. 2006) (upholding a detention of approximately one hour); *Davis*, 430 F.3d at 354-55 (upholding an approximately thirty-minute detention); *United States v. Scales*, No. 3:22-CR-20-KAC-JEM-2, 2024 WL 841191, at *5 (E.D. Tenn. Feb. 28, 2024) (upholding a twenty-five-minute detention). Moreover, the use of a drug sniffing dog while a suspect is detained is not intrusive. *Scales*, 2024 WL 841191, at *5 (citing *Illinois v. Caballes*, 543 U.S. 405, 409 (2005)). Given this precedent, the Court finds that the, at-most, eleven-minute detention pending the arrival of a drug detection K9 was constitutionally permissible under the Fourth Amendment. As such, the Court finds that Defendant's rights were not violated, and the evidence at issue should not be suppressed.[10]

---

[9] While another eight minutes elapsed between the K9's arrival on the scene and the free air sniff being conducted, the delay was due to the refusal of Defendant and Hamilton to exit the vehicle and not because of any dilatory behavior on the part of officers.

[10] Given this conclusion, the Court finds it unnecessary to address the United States' argument that the exclusionary rule would permit the admission of this evidence.

## IV. CONCLUSION

For the reasons outlined above, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress [Doc. 129] be **DENIED**.[11]

Respectfully submitted,

/s/Cynthia Richardson Wyrick
United States Magistrate Judge

---

[11] Any objections to this report and recommendation must be served and filed within **fourteen (14) days** after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see *United States v. Branch*, 537 F.3d 582 (6th. Cir. 2008); see also *Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).